# CHARLESTON.

## MYERS *v*. MYERS.

Submitted January 30, 1900—Decided March 24, 1900.

1. GUARDIAN— *Ward—Resulting Trust.*

To create a resulting trust in favor of a ward in a tract of land purchased by his guardian, the trust funds must either have been paid at the time of, or entered into the consideration for the contract of purchase, though afterwards paid. (p. 490).

2.  PURCHASE BY GUARDIAN— *Wards—Funds.*

    If a guardian purchases a tract of land with her own money
    and on her own credit, and takes the deed in her own name,
    the mere fact that she satisfies the unpaid purchase money
    out of the guardianship funds, which afterwards come into
    her hands, cannot create a resulting trust in favor of her
    wards. A court of equity, in a proper case, may treat such
    funds so used, and to the extent thereof, as a charge against
    the land. (pp. 490-491).

3.  GUARDIAN—*Funds—Necessaries.*

    A guardian, having no funds legally applicable thereto, who
    furnishes necessaries to his ward, has the same right to en-
    forcement and reimbursement thereof as any other person
    furnishing such necessaries. (p. 494).

4.  EQUITY—*Litigation Unjust.*

    A court of equity will not countenance the unjust litiga-
    tion of an undutiful son against his mother, although she
    is his legal guardian. (p. 496).

Appeal from Circuit Court, Harrison County.

Bill by Jefferson Myers against Laura A. Myers. De-
cree for defendant, and plaintiff appeals.

*Affirmed.*

HARVEY W. HARMER, for appellant.

JOHN BASSELL and EDWIN MAXWELL, for appellee.

DENT, PRESIDENT :

In the circuit court of Harrison County, Jefferson
Myers, son, brings a suit against Laura A. Myers, mother
and guardian, to enforce an alleged resulting trust in a
tract of seventy-nine acres of land owned by the latter.
The circuit court found against the son, and he appeals.

The facts are as follows: In 1874, John C. Myers died,
leaving a widow, the defendant, and five sons, of which the
plaintiff was one, at that time about one year old. He left
a small amount of personal property, and some real estate
heavily incumbered with debts. His father qualified as
his administrator, and proceeded to sell his property and
pay his debts. About the year 1878 the defendant received
from the estate her dower, amounting to one thousand and
eighty-seven dollars and fifty cents. She used a portion
in maintaining herself and children, and on the 25th of

March, 1879, she purchased a small tract of land, containing seventy-nine acres, at the price of one thousand three hundred dollars, seven hundred and twenty-eight dollars of which she paid cash in hand, being the residue of her dower, and gave her three notes, one for one hundred and seventy-two dollars, and the others for two hundred dollars, each, payable annually. Some time afterwards she borrowed the money, and paid off these notes, and gave a deed of trust on the land to secure this loan. In the year 1883 she received in round numbers, for her five sons, about eight hundred dollars, being the balance on the sale of the real estate after payment of debts. This money she used in paying off the trust deed. In 1884 she settled her accounts as guardian of the plaintiff before a commissioner, who found, after deducting proper credits, a balance of one hundred and one dollars and forty-three cents due the plaintiff, subject to a printer's fee of one dollar and fifty cents; leaving in her hands, as such guardian, a net balance of ninety-nine dollars and ninety-three cents. Plaintiff was at that time, and had been, living with his mother, and supported by her since his father's death. About this time he began to work out and live with others, but was at home off and on. He went over in Tucker County to work, and in 1890 he was brought home an invalid, having been injured in the mines, and his mother received him and nursed him back to health, and paid his physician's bills. She also paid some store bills for him, and, after he was able, sent him to a private school, and paid his tuition. He wanting to buy a horse from her, she gave it to him. She settled with all the other children satisfactorily when they became of age. He made no demand on her, and she considered his claim fully settled by the services she had rendered him and the money she had paid out for him. At length, about the time of the institution of this suit, oil developments reached this land. The plaintiff conceived the idea of setting up a resulting trust therein on account of his money used by his mother in the payment of the trust lien against the same. He filed his bill. She answered, denying his right to any interest in the land, insisting that she owed him nothing, by reason of her services and the expenditures aforesaid, and alleged

her willingness and ability to pay any amount that might be found due plaintiff on a fair settlement any time. The only evidence on which the plaintiff founds his claim for a resulting trust is that of George W. McKcown, the vendor from whom his mother purchased the land, and is to the effect that she said she had no money to pay the deferred payments, but that Jacob Myers had the children's money, and that was the money with which she expected to meet the payments. In the case of *Lehman* v. *Lewis*, 62 Ala. 133, it is said: "The general rule is that, when a resulting trust is sought to be established and ingrafted upon a conveyance absolute in its terms, the complainant must by his bill distinctly and precisely aver the facts from which it is claimed to result. The proof must correspond with the pleading, and must be clear, full, satisfactory, and convincing. If the proof is uncertain, if it is doubtful and unsatisfactory, relief cannot be granted. The presumption arising from the conveyance, that it fully speaks the whole truth, must prevail until the contrary is established beyond reasonable controversy. The burden of removing this presumption rests upon the party asserting the contrary, and it is not enough for him to generate doubt and uncertainty. 'A judgment of the court, a deliberate deed or writing, are of too much solemnity to be brushed away by loose and inconclusive evidence.' *Howland* v. *Blake*, 97 U. S. 626, 24 L. Ed. 1027." 10 Am. & Eng. Enc. Law, 49. In the case of *Webb* v. *Bailey*, 41 W. Va. 463 (23 S. E. 644), it was held that the time of payment made no difference, provided it was made in pursuance of the contract of purchase; that is to say, that, if the contract was entered into with the understanding that the trust funds were the source of payment, then a resulting trust would follow. But if the property is purchased with funds, and on the credit, of the purchaser, and she takes the title in her own name, and afterwards uses the trust fund in payment of her indebtedness for the land, there can be no resulting trust, although, in case of her insolvency or lack of security, the land might be charged with the amount of the fund used, except in the hands of an innocent purchaser without notice, as equity will follow trust funds so long as they can be identified

without injury to innocent third parties.   The trust must be coeval with the transfer of the property, or it can have no existence at all.   In the case of *French* v. *Sheplor*, 83 Ind. 266, it is held:  "Where a guardian purchases lands for himself, upon his own credit, and takes a conveyance, and afterwards, in violation of his duty, uses the money of his wards in payment of the purchase money, no trust in the lands results or arises in favor of the wards."

The defendant purchased this land in her own name, used her own money in part payment thereof, and her credit and a lien on the land for the residue, and afterwards borrowed the money to satisfy this lien, and gave a deed of trust to secure the same, and then, as guardian, used an inconsiderable amount of the plaintiff's money to discharge the trust lien, but is able and has held herself ready and willing, at all times to account to him for it. The mere fact that she told the truth to her vendor, that she had no other source to look to for the payment of her notes than the children's money in the hands of their grandfather, is not sufficient to create a resulting trust; for she did not in any manner  bind these funds, or ever agree  to pay them on such purchase money,  but used only her individual credit, and the estate created by the investment of her own funds in the land.   The vendor did not receive any of the guardianship funds, nor did he bind himself  or agree to look to them for payment.   He was amply secured without doing so.   Hence the guardianship funds did not enter into the contract of purchase, and therefore no resulting trust could arise by reason of their after use.   The circuit court committed no error in holding that the plaintiff was not entitled to the specific relief sought.

The plaintiff's counsel insists that the court erred in not directing an account under the prayer for general relief.   The court's order is as follows:  "Upon consideration whereof, it appears to the court that the plaintiff is not entitled to the specific relief prayed for in his bill, in so far as the same seeks to set up an implied or resulting trust as against the defendant, and, the plaintiff not asking to prosecute his suit for any other matter alleged in his bill, it is adjudged, ordered, and decreed that the

plaintiff's bill be dismissed, but without prejudice," etc. From this it is plain the circuit court gave the plaintiff opportunity to have an account if he wish it, but, he declining it, the court could do nothing else but dismiss. Nor is it plain that the plaintiff was entitled to an account. According to his own evidence, his mother had offered him many times the amount she could possibly have been indebted to him not to sue her or abandon his suit, and he refused to accept it. She says, on the other hand, that she owed him nothing, but, on a fair settlement of accounts, he would be indebted to her. Up until he was about eleven years of age she had to support and care for him, and used her dower estate in so doing. No doubt she many times denied herself the actual necessities of life, that her children might be provided for to the full extent of her ability. Then she received his patrimony, amounting to ninety-nine dollars and ninety-three cents. The interest of this sum she was intitled to use in his maintenance, and reimbursing herself for excess of expenditures. Six dollars per annum for a mother's love and care! He complains she did not make annual settlements. The taxes, costs, and expenses of such settlements would more than have devoured the income of his estate, and left nothing for his maintenance. The letter of the law must bend to its spirit, and equity will not require a literal compliance therewith to the injury of both guardian and ward. *Maguire* v. *Doonan*, 24 W. Va. 507. It must be considered, then, that the mother had the right and did use the interest on his estate in his behalf. That would still leave in her hands, unaccounted for, ninety-nine dollars and ninety-three cents. In 1890, when he had almost reached his majority, and had passed out from under his mother's care, and was supporting himself, he was injured in the Tucker County mines, and brought back to his mother's care a helpless invalid. She was under no legal obligations to receive him, but she might have laid aside her motherly affection and treated him as he has seen fit to treat her in these proceedings,—as a stranger of strangers, without a tie of blood or kinship; but she received back his bruised and wounded body, and for twenty long weeks watched over him night and day, nursed him back to life and health

again, and was then compelled by him to pay even his store, doctor, and tuition bills, and when he wanted to purchase a horse of her she kindly made him a present of it. She claims that all this was more than a sufficient offset to the ninety-nine dollars and ninety-three cents, but he insists that her claim was a gift, and is barred by the statute of limitations. She claims that she only asks it as a credit on the ninety-nine dollars and ninety-three cents. He answers, "But you had no right to use this money during my infancy in paying my debts, and providing me with things absolutely necessary for my comfort and enjoyment, because you did not first obtain an order of court authorizing the expenditure of this fund, and you are therefore not entitled to any credit therefor." That is to say, when he was brought to her door, a helpless invalid, that she could not receive him, provide him with a physician, food, and medicine, and look to him for payment thereof, unless she first employed a lawyer, filed a petition in the circuit court, had a guardian *ad litem* appointed, took the necessary depositions, and had an order of the court entered, allowing her, after the payment of costs therefrom, to disburse the ninety-nine dollars and ninety-three cents, if there was any balance left. This law was never intended, in all its strictness, to apply to estates of small or inconsiderable value, or in cases of emergency or necessity. If it was, the sooner it is repealed or modified the better it will be for the children whom it was made to protect. It is the duty of a court of chancery, having jurisdiction of such matters, to so construe it as to make it operate with justice and equity. In short, the rules and principles of equity must be applied to it. He who seeks must do equity. An infant, without regard to guardianship, is liable for necessaries. Blackstone says an infant "may bind himself to pay for his necessary meat, drink, apparel, physic, and such other necessaries, and likewise for his good teaching and instruction, whereby he may profit himself afterwards." In 10 Am. & Eng. Enc. Law, 660, the law is stated to be: "There are some contracts manifestly for the benefit of the infant, where it would be detrimental to his interests not to be bound by them. Such contracts the law holds as binding as contracts between adults.

These contracts have to do with the existence and proper maintenance of the infant, and he might suffer severely if he could not pledge his credit for the supply of necessaries to himself. Food, lodging, clothing, medical attendance, and education are the leading elements in the doctrine of necessaries." The mere fact that an infant is under guardianship, if he has no estate legally liable for his maintenance, does not destroy his liability for necessaries. And a guardian, without such estate, has the same right to furnish him such necessaries as any other individual. And the guardian, after his ward reaches his maturity, if he have no estate applicable to the payment of the same, may hold such ward personally responsible for necessaries furnished him during his minority. The fact that section 9, chapter 82, Code, provides, that neither the ward personally, nor his real estate, shall be liable for disbursements authorized by the court, does not destroy his common-law liability for necessities. Nor does the fact that, under section 8, the guardian cannot, in his guardianship settlements, be allowed his expenditures over and above the ward's annual income and the disbursements authorized by order of court, destroy the guardians' individual common-law right to hold his ward liable for necessaries furnished him for the payment of which there are no funds or estate in his hands legally liable. In Woerner, Guardianship, 187, it is said, "It is an old and familiar doctrine that infants and other persons under disability to contract are bound, nevertheless, for necessaries, to the extent of their reasonable value, to those who furnish them by reason of their need or at the request of the infant. * * * For necessaries so furnished by a guardian, he will be reimbursed out of the ward's estate." *Reading* v. *Wilson*, 38 N. J. Eq. 446; *Brent* v. *Grace's Adm'r*, 30 Mo. 253, 256; *Wallis* v. *Neale*, 43 W. Va. 529, (27 S. E. 227). The ward suing the guardian for a settlement after he reaches his majority, a court of equity will not require the guardian to establish his individual claim for necessaries at law, but, having jurisdiction for one purpose, will do complete justice between the parties. Nor will it allow a just claim for necessaries in excess of the funds in the guardian's hands, to the extent of such funds, to be barred

by the statute of limitations, but will presume from the lapse of time the ward was in bringing his suit, taken together with other circumstances, that the ward, on coming of age, acquiesced in the application of such funds to the payment of such necessaries. This is a very strong case for the application of this doctrine. The Plaintiff, when about nineteen years of age, was severely injured. He was taken to his mother's home. He required, as absolute necessities, shelter, nursing, medicine, clothing, and food for twenty weeks, and also while he was convalescing, she sent him to school, and gave him a horse; in all as she maintains amounting to four hundred and thirty dollars and sixty-four cents. For all this she made no charge except she expected it to be a satisfaction of the ninety-nine dollars and ninety-three cents that she had formerly used in his support and in payment of the deed of trust lien on the land. To his four brothers, on reaching their majority, she paid each one hundred and fifty dollars, which they received in full satisfaction of all claim against her, accepting it probably more as a gift from her than otherwise. When he reached his majority he said nothing to her about a settlement, nor she to him, as she had paid him as she claims far more than his portion. He awaits four years uncomplainingly, tacitly acquiescing in his mother's disposition of the matter, until the oil developments reached the neighborhood, when the greed for gain takes possession of his soul. Then he proceeds to harass his mother with this suit,—as unconscionable a suit, probably, as ever was instituted. The love of money is certainly the root of all evil, when it will destroy the filial obligation, duty, and affection which a son owes to his widowed mother, and cause him to seek to gain an undue advantage over his brothers. His mother told him, in effect: "The whole estate will belong to you boys when I am dead; then do not waste your money in useless litigation." But he cared not for the pain, sorrow, and humiliation that he might cause to her gray hairs, and forgot the years of anxious care and watching she had expended in his behalf, and the greed for gain crushed out all the nobler purposes of his heart, and closed his eyes to all the harmful consequences that might result to others. Money he wanted, and money he would have,

though the price he paid was a mother's love and his brothers' affection. A court of equity cannot disregard the tender relations of human life, and in all its decrees it should preserve and cherish them. It can give no countenance to the unjust cause of an undutiful son against a kind and forbearing mother. The decree is affirmed.

*Affirmed.*