MILDRED SMALL, BY HER NEXT FRIEND, W. L. BALTHIS, v. JOHN R. MORRISON, THE GLOBE INDEMNITY COMPANY, AND J. C. SMALL.

(Filed 8 June, 1923.)

1. Contracts — Policies—Indemnity—Actions—Beneficiaries—Conditions Precedent.

The principles upon which the beneficiaries of an indemnity policy may recover against the insurance company cannot have effect against the express terms of the policy, requiring as a condition precedent that no action thereon may be maintained by the beneficiary "unless and until execution against the assured is returned unsatisfied" in an action brought against him; and when the alleged cause of action cannot be maintained against the assured, none can be maintained against the indemnity company that issued the policy.

2. Parent and Child—Domestic Relations—Personal Injury—Actions—Torts—Public Policy.

It is against the policy of the law in the furtherance of domestic peace and happiness, to permit an unemancipated minor child living at the home of her father as a member of his family, to maintain an action against him for his tort, for a personal injury she has received, alleged to have been caused by his negligence in running an automobile in which she was riding at the time, the welfare of the child being looked after by the courts and by statute especially enacted for the purpose in certain instances, but without statute permitting a recovery of this character, as in case of a wife in her action against her husband.

HOKE, J., concurring; CLARK, C. J., dissenting; CLARKSON, J., not sitting or taking part.

APPEAL by plaintiff from *Long, J.,* at March Term, 1923, of GASTON.

Civil action on behalf of the infant plaintiff, brought by her next friend, to recover damages of her father, J. C. Small, the Globe Indemnity Company, and John R. Morrison for an alleged negligent injury caused by the collision of two automobiles, one driven by plaintiff's

father and the other by John R. Morrison. The defendants J. C. Small and the Globe Indemnity Company each demurred to the complaint. Demurrers sustained, and the plaintiff appealed. The defendant John R. Morrison filed answer denying liability, and does not appeal, as the case against him has not yet been tried.

*Mangum & Denny for plaintiff.*
*Clarkson, Taliaferro & Clarkson for defendant Small.*
*C. W. Tillett, Jr., for defendant Globe Indemnity Company.*

STACY, J. Mildred Small, 9-year-old daughter of J. C. Small, brings this action against her father, the Globe Indemnity Company, and John R. Morrison to recover damages for an alleged negligent injury caused by the collision of two automobiles, one owned and driven by the defendant J. C. Small, with whom plaintiff was riding at the time, and the other owned and driven by the defendant John R. Morrison. It is alleged that plaintiff's injuries were caused by the negligence of each or both of the individual defendants. The Globe Indemnity Company is joined as a party defendant because it is alleged that J. C. Small, plaintiff's father, carried a policy of liability insurance with said company, wherein it agreed "to indemnify the assured against loss from the liability imposed by law upon the assured for damages as a result of the ownership, maintenance, or use of any of the said automobiles"; with a provision that the total liability of the company under the policy should not exceed $5,000 for injury to any one person.

J. C. Small and the Globe Indemnity Company demur to the complaint for the following reasons: (1) Because plaintiff, the unemancipated minor child of defendant J. C. Small, cannot maintain this action against her father; and (2) because there is a misjoinder, both of parties defendant and of causes of action—the one sounding in tort and the other arising *ex contractu,* according to the allegations of the complaint. *Shore v. Holt, ante,* 312, and cases there cited. (3) The Indemnity Company further demurs because it is provided that no claim on the part of the plaintiff can arise under the policy in question until execution against the defendant J. C. Small shall have been returned unsatisfied in an action brought against him. For this position, the defendant relies upon the cases of *Newton v. Seeley,* 177 N. C., 528; *Clark v. Bonsal,* 157 N. C., 270, and *Hensley v. Furniture Co.,* 164 N. C., 148.

The principle announced in *Gorrell v. Water Supply Co.,* 124 N. C., 328; *Fisher v. Water Co.,* 128 N. C., 375; *Jones v. Water Co.,* 135 N. C., 544, and *Morton v. Water Co.,* 168 N. C., 582, to the effect that, in certain cases, a beneficiary under a contract, though not a formal party thereto, may maintain an action for its breach, can have no application

to the facts of the present record; for here, by express stipulation, the indemnitor is not to be held liable in an action at the instance of the injured party, unless and until "execution against the assured is returned unsatisfied" in an action brought against him. This, in terms, is made a condition precedent to the right of the injured party to maintain an action against the indemnity company; and where the rights of the parties are fixed by contract, the law will uphold such rights. *Clancy v. Overman,* 18 N. C., 402; *Clark v. Bonsal, supra,* and cases there cited. The assured could have applied for, and no doubt obtained, a policy of insurance which would have given the instant plaintiff a right to maintain an action against the indemnity company, without first suing the assured, but this was not done, and we are not at liberty to add such a provision to the present contract. The question of liability must be determined according to the rights and duties of the parties at the time of the injury.

The right of the plaintiff to proceed against the Indemnity Company must of necessity rest upon her right to sue her father in tort; and, if this be denied, the judgment sustaining the demurrer should be affirmed. Holding, as we do, that such remedy is not available to the instant plaintiff in an action like the present, we deem it unnecessary to consider the other grounds urged in support of the demurrers.

While this position is supported by all the authorities on the subject, with none to the contrary, it is worthy of note that in the entire judicial history of this country and of England not more than four or five cases involving the question have found their way to any of the appellate courts. This within itself would seem to be a circumstance tending to show not only the soundness of the position, but also that it is founded in natural justice and in keeping with the eternal fitness of things; otherwise a number of cases might have been expected, some involving the most trivial and others the most serious allegations of negligence. To entertain the present suit, would be to open the doors of the courts to every minor child who has suffered an injury, real or imaginary, at the hands of its parents on account of their neglect, or want of due care, in providing for or looking after its welfare. This, to say the least, would be unseemly if not productive of great mischief.

The principal reasons assigned for denying to minor children the right to sue their parents in tort are clearly stated in 20 R. C. L., 631, as follows: "It is well established that a minor child cannot sue his parent for a tort. The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent. An unkind and cruel

SMALL *v.* MORRISON.

parent may and should be punished at the time of the offense, if an offender at all, by forfeiting custody and suffering criminal penalties, if need be; but for the minor child who continues, it may be for long years, at home and unemancipated, to bring a suit, when arrived at majority, free from parental control and under counter influences, against his own parent, either for services accruing during infancy or to recover damages for some stale injury, real or imagined, referable to that period, appears quite contrary to good policy. And this rule has been applied not only in cases of excessive punishment, or other assault and battery, but to the most extreme case possible, that of the ravishment of a minor daughter by her father."

Again, in 29 Cyc., 1663, it is said: "Actions by children against their parents are not to be encouraged unless to redress clear and palpable injustice, and a minor child has no right of action against a parent for the tort of the latter."

Apparently the earliest reported case in this country involving the question under consideration is *Hewlett v. George,* 68 Miss., 703; 9 So., 885; 13 L. R. A., 682 (1891). Here a minor daughter, who had been married, but who at the time of the alleged injury was separated and living apart from her husband, brought suit against her mother for wrongfully confining her in an insane asylum. The Court, remarking that there was not sufficient evidence to show that she had not resumed her former place in her mother's home, and was therefore unemancipated, held as follows: "If, by her marriage, the relation of parent and child had been finally dissolved, in so far as that relationship imposed the duty upon the parent to protect and care for and control, and the child to aid and comfort and obey, then it may be the child could successfully maintain an action against the parent for personal injuries. But, so long as the parent is under obligation to care for, guide, and control, and the child is under reciprocal obligation to aid and comfort and obey, no such action as this can be maintained. The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent. The state, through its criminal laws, will give the minor child protection from parental violence and wrong-doing, and this is all the child can be heard to demand."

The next case is *McKelvey v. McKelvey,* 111 Tenn., 388; 77 S. W., 664; 1 Ann. Cas., 130 (1902). This was a suit instituted by a minor against her father and stepmother, seeking to recover damages for cruel and inhuman treatment alleged to have been inflicted upon her by the stepmother at the instance and with the consent of the father. The suit

was dismissed upon demurrer, and the Supreme Court upheld the judgment of dismissal. The case of *Hewlett v. George, supra,* was approved and quoted from at length. The following is taken from the opinion: "So far as we can discover, this rule of the common law has never been questioned in any of the courts of this country, and certainly no such action as the present has been maintained in these courts. It is true that no less celebrated an authority than *Judge Cooley,* in the second edition of his work on Torts, at page 171, observes that 'in principle there seems to be no reason it should not be sustained. No case, however, is cited in support of this text. In fact, the only case which the diligence of counsel has been able to find in which this particular question has been discussed is that of *Hewlett v. George,* reported in 68 Miss., 703; 9 So. Rep., 885; 13 L. R. A., 682."

The next case in point of time (1905) is *Roller v. Roller,* 37 Wash., 242; 79 Pac., 788; 68 L. R. A., 893. In this case the defendant had been convicted of a very serious and aggravated assault upon his minor daughter, and she brought suit to recover of him damages therefor. Defendant demurred to the complaint, and the case went up on the judgment overruling the demurrer, which judgment was reversed in the appellate court on the ground that a minor child has no cause of action against her father for tort committed.

In the course of its opinion the Court said: "The rule of law prohibiting suits between parent and child is based upon the interest that society has in preserving harmony in the domestic relations, an interest which has been manifested since the earliest organization of civilized government, an interest inspired by the universally recognized fact that the maintenance of harmonious and proper family relations is conducive to good citizenship, and therefore works to the welfare of the State.

"This view, in effect, is not disputed by the respondent, who admits the general proposition that the domestic relations of the home and family fireside cannot be disturbed by the members thereof, by litigation prosecuted against each other for injuries, real or imaginary, arising out of these relations; but he asserts that the law has well-defined limitations, and that every rule of law is founded upon some good reason, and the object and purpose intended to be attained must be looked to, as a fair test of its scope and limitations; that, in the case at bar, the family relations have already been disturbed, and that, by action of the father, the minor child has, in reality, been emancipated; that the harmonious relations existing have been disturbed in so rude a manner that they never can be again adjusted; and that, therefore, the reason for the rule does not apply.

"There seems to be some reason in this argument, but it overlooks the fact that courts, in determining their jurisdiction, or want of jurisdic-

tion, rely upon certain uniform principles of law, and, if it be once established that a child has a right to sue a parent for a tort, there is no practical line of demarkation which can be drawn; for the same principle which would allow the action in the case of a heinous crime, like the one involved in this case, would allow an action to be brought for any other tort. The principle permitting the action would be the same. The torts would be different only in degree. Hence, all the disturbing confusion would be introduced which can be imagined under a system which would allow parents and children to be involved in litigation of this kind.

"Outside of these reasons, which affect public policy, another reason, which seems almost to be *reductio ad absurdum,* is that, if a child should recover a judgment from a parent, in the event of its death the parent would become heir to the very property which had been wrested by the law from him. In addition to this, the public has an interest in the financial welfare of other minor members of the family, and it would not be the policy of the law to allow the estate, which is to be looked to for the support of all the minor children, to be appropriated by any particular one.

"At common law it is well established that a minor child cannot sue a parent for a tort. It is said by Cooley on Torts, p. 276, under the title of 'Wrongs to a Child': 'For an injury suffered by the child in that relation no action will lie at the common law.' And this has been held to be analogous to coverture, where a husband or wife is forbidden to sue the other spouse for torts or wrongs committed upon them to their damage during coverture, even refusing the action after the relation, by a divorce, has ceased to exist. See *Abbott · v. Abbott,* 67 Me., 304; 24 Am. Rep., 27, which is simply an expression of the universal law on that subject. See, also, *Bandfield v. Bandfield,* 117 Mich., 80; 75 N. W., 287; 72 Am. St., 550; 40 L. R. A., 757.

"Mr. Schouler, in his work on Domestic Relations, sec. 275, after discussing the proposition of filial relations, says: 'With reference to a blood parent, however, all such litigation seems abhorrent to the idea of family discipline which all nations, rude or civilized, have so steadily inculcated, and the privacy and mutual confidence which should obtain in the household. An unkind and cruel parent may and should be punished at the time of the offense, if an offender at all, by forfeiting custody and suffering criminal penalties, if need be; but for the minor child who continues, it may be for long years, at home and unemancipated, to bring a suit, when arrived at majority, free from parental control and under counter influences, against his own parent, either for services accruing during infancy or to recover damages, for some stale injury, real or imagined, referable to that period, appears quite contrary to good policy. The courts should discourage such litigation. . . .'

"This text goes beyond the circumstances of the case at bar, where the action was brought during the minority of the plaintiff. As will be seen by the extract above quoted, it is even forbidden after the child becomes of age, if the injury sued upon is referable to the period of minority. So well is this principle of the law understood that there have been very few attempts to inaugurate actions of this kind. The only one to which we are referred by brief of counsel, or which we have been able by independent investigation to discover, which seems to be in point, is *Hewlett v. George,* 68 Miss., 703; 9 South., 885; 13 L. R. A., 682, where it was held that a parent is not civilly liable to a child for personal injuries, inflicted during minority, and where the relation of parent and child with its mutual obligations exist."

The last reported case upon the subject seems to be *Taubert v. Taubert,* 103 Minn., 247; 114 N. W., 763 (1908), which was presented upon the following facts:

Plaintiff's father died leaving a tanning and fur-dyeing business which the mother of the 17-year-old plaintiff was carrying on as administratrix of the estate of her deceased husband. The plant was under the active superintendency of Paul Taubert, an adult and older brother of the plaintiff, and plaintiff was injured while working as an employee at the plant and assigned the negligence of his brother, the superintendent, as the cause of such injury. The case is analogous to the present one in that the mother carried a policy of liability insurance and the insurance company joined in the defense of the suit, though not as a formal party defendant. There was a verdict for the plaintiff, and on appeal to the Supreme Court, judgment of the lower court was set aside upon the ground that a minor, unemancipated, could not sue his parent in an action based on tort.

The following is taken from the opinion of the Court: "The general rule is that a minor cannot sue his parent for a tort; but, if he has been emancipated, he can. A mere waiver, however, by the parent of the right to the earnings of his minor child does not alone constitute such emancipation. There must be a surrender by the parent of the right to the services of his minor child, and also the right to the custody and control of his person. 1 Jaggard, Torts, 462; 1 Cooley, Torts (3 ed.), 493. The disability of a minor to maintain an action for tort against his parent arises from the family relation, which may exist intact, although a minor may have been given the right to receive as his own his wages; hence, to take a case out of the general rule, there must be not only a waiver of the minor's services, but a surrender of parental control over him. The trial court correctly charged the jury as to this question of the plaintiff's emancipation. It is, however, earnestly contended on behalf of the defendant that the evidence shows that the emancipation

of the plaintiff was limited to plaintiff's wages, and that other than this there was no change in the parental relation. The evidence is amply sufficient to sustain a finding that the mother waived her right to the plaintiff's wages, and that she employed him to work for her in the factory for the stipulated compensation of $6 a week and his board and lodging in her home. But on the question whether she freed him from her parental custody and control the evidence is not entirely satisfactory, but sufficient, nevertheless, to justify the submission of the question to the jury."

The argument in favor of sustaining a recovery in cases like the present seems to be that, on principle, there is no reason why the parent should not be subject to a civil responsibility similar to that of a guardian or teacher, who, though standing *in loco parentis,* is liable for excessive punishment. Cooley on Torts (2 ed.), 198. We think this argument, however, is more than overcome by practical considerations of public policy, which discourage causes of actions that tend to destroy parental authority and to undermine the security of the home. No greater disservice could be rendered to any child than to teach its feet to stray from the path of rectitude, or to suffer its mind to be poisoned by ideas of disloyalty and dishonor. The policy heretofore established in this State with respect to the maintenance of the family as the social unit is diametrically opposed to the communistic theory which Russia has unsuccessfully sought to put into practice. From the very beginning the family in its integrity has been the foundation of American institutions, and we are not now disposed to depart from this basic principle. Freedom in this country is the self-enforcement of self-enacted laws; and liberty with us is the right to go and do as you please under the law, or so long as you please to do right. Hence, in a democracy or a polity like ours, the government of a well ordered home is one of the surest bulwarks against the forces that make for social disorder and civic decay. It is the very cradle of civilization, with the future welfare of the commonwealth dependent, in a large measure, upon the efficacy and success of its administration. Under these conditions, the State will not and should not permit the management of the home to be destroyed by the individual members thereof, unless and until the interests of society itself are threatened. Whenever this occurs, adequate provision for the protection of the community, as well as the members of the family involved, has been supplied in the form of juvenile courts, welfare officers, etc. To say that a minor child, while living in the household of its parents, must be given the right to sue the latter for a tort committed, or else be declared an "outlaw," is simply begging the question and overlooking entirely the consequences that such a proceeding would have upon the household of which said child is an important member and component part. In this society of ours, complex as it is,

all rights are relative; and the courts, as well as the Legislature, must look to the larger good and not merely to the smaller hope: They are not to be "penny wise and pound foolish." It is conceded that the case at bar must be decided on general principles, as there is no enactment of the General Assembly covering the subject; and it is further conceded that we have not yet adopted the destructive theory of communism as a governmental policy in this country.

In *Roller v. Roller, supra,* the Washington Court seems to have considered all the arguments in support of, as well as those against, the doctrine announced in the several cases. To permit a minor child to sue its father for a tortious wrong would be to allow the child to take from its parent that which is already dedicated to its support and maintenance; because the law says that a parent must provide, according to his means, for the support, care, and maintenance of his minor children. It would also allow one minor child to gain an advantage over his minor brothers and sisters at the expense of the common fund which has been dedicated to a fair and equal support of them all. And further, even taking the plaintiff's view, a suit would do no more than award to the injured child that which the simple dictates of family life have already impressed with a trust in its favor. In this respect, it is permissible to observe that generosity is not a stranger to a willing hand, but it is to a forced one.

There are some things that are worth more than money. One of these is the peace of the fireside and the contentment of the home; for of such is the kingdom of righteousness. While the family relation of parent and child exists, with its reciprocal rights and obligations, the latter should not be taught "to bite the hand that feeds it," and no such action as the present should be entertained by the courts. As the twig is bent, the tree will incline; and it is the inexorable law of nature that whatsoever a man soweth, that shall he also reap. Grapes are not gathered from the thorn-bush, nor figs from the thistle. It is doubtful if any age promises a sweeter remembrance than that of a happy childhood, spent in the lovelight of kindly smiles and in the radiance of parental devotion. "Honor thy father and thy mother that thy days may be long upon the land which the Lord thy God giveth thee" is an injunction from on high, and it contains as much truth today as it did under the Mosaic dispensation. Verily, it is a command of Holy Writ—good for all time. In youth the currents of life are prodigal in their racing course, and we shoud be slow to encourage or to permit a minor, in the household of its parents, unemancipated, and who has not yet arrived at the age of discretion, acting only upon the advice of a "next friend," to run the risk of losing a priceless birthright and a rich inheritance in an effort to gain for the moment a mere mess of pottage, or a few pieces of silver. If

this restraining doctrine were not announced by any of the writers of the common law, because no such case was ever brought before the courts of England, it was unmistakably, and indelibly carved upon the tablets of Mount Sinai.

Of course, nothing we have said in this opinion is to be understood as withdrawing in the least from a minor child its right of protection against a cruel and unkind parent. Should the occasion arise, or whenever necessary, the State will provide for its care and custody, because it is interested in its welfare; and, if need be, an offending parent will be visited with the pains and penalties of the criminal law. See C. S., ch. 90, on the subject of "Child Welfare." The right of a minor child to bring an action against its parent in respect to the latter's dealing with its property is unquestioned; but this right rests upon another principle, not involved in this proceeding. The law will not permit a parent, or other, to take the property of a minor child, or any one else, hold it unlawfully, and thus profit by his own wrong. This would be an unjust enrichment which the law cannot condone. *Walker v. Crowder*, 37 N. C., 487.

There is no authority at the common law for an action like the present; and while some may not regard the sources of the common law with reverence or with respect, yet, in its truest and most comprehensive sense, the common law is the richest heritage of the race. It is the embodiment of usage and general customs, common to all mankind; it is grounded in natural justice, and it is based upon rules of conduct which have been sanctioned by common consent and approved by the wisdom and experience of the ages. In this broad sense, it is contemporaneous with history itself; in fact, it is history; and the sources of both are lost in the mystery that characterizes all origins. There is no statutes in North Carolina which authorizes an action of this kind, and we are of opinion that the judgment sustaining the demurrers is in keeping with a sound public policy. For this reason the judgment must be upheld.

Affirmed.

CLARKSON, J., having been of counsel, took no part in the consideration or decision of this case.

HOKE, J., concurring: At common law an action for a pure tort was not maintainable by a minor child against its parents while a member of the family. For wrongs involving a trespass to, or a misappropriation of, property an action would lie. For in that respect the child is regarded as a separate entity, and a different principle prevails. But for torts disconnected with contract or proprietary rights, in so far as

examined, no such action has heretofore been maintained in England, and whenever it has been attempted in the American courts, such a right has been consistently rejected, and as shown in the principal opinion, the text-books of established merit are in full approval of the principle. Not only is this true by authority, but the position is in accord with right reason. We have had occasion to note, in several of our more recent decisions, that the influences which proceed from a well ordered home are among the chiefest bulwarks of our social order, and for that reason, among others, a family has been always regarded by the law as a government within itself, and to be interfered with only when required for the preservation of the public peace, or for the protection of dependent children as members and potential citizens of the commonwealth. But an interference on any other principle in breach of the family ties and relationships has thus far never been recognized or tolerated.

And the objections urged to the court's ruling on the resent record are so inadequate and at times irrelevant that they tend rather to confirm than to weaken the decision on the question presented.

It is contended in the first place that the action is really against the Indemnity Company, and an effort to interpose this wholesome common-law principle, to which we have referred, in protection of such company is the merest "camouflage," but not so. The reason it is required to take note of this alleged right of action on the part of the child against the parent is because the Indemnity Company in its contract has made express stipulation that no liability shall arise against the company unless and until a judgment is first had against the principal—in this instance the father—and therefore it is that the liability of the father is a condition precedent to that of the company, and must first be considered and determined. Such a position can by no means be considered as camouflage, as we understand the meaning of the term, but it is upholding the integrity of contracts, a principle which lies at the very base of all confidence among men in their business dealings with each other, and in this instance is required also to the proper administration of impartial justice alike to the corporation and to the individual.

Again it is insisted that the courts in their triumphant march towards higher and better things have struck off the shackles which have hitherto restrained the wife from suing the husband in such an action as this, and by that same token the child should be allowed to sue its parents in like case, and *Crowell v. Crowell,* 180 N. C., 516, is cited in support of the principle. An examination of this, and like cases, however, and the opinion of *Associate Justice Stacy,* denying a petition to rehear the *Crowell case, supra,* in 181 N. C., 66, will disclose that this right of the wife is based on certain recent legislation, making such definite provision as to her right to maintain this and all other litigation affecting

her interests that the policy of the law upon which this principle rests is held to have been altered as to the wife, by the legislative will; and for that reason the action by the wife was sustained, but there has been no such legislation in reference to the case of parent and child, and therefore the principle of the common law which forbade the maintenance of any such action as between them should still be allowed to prevail.

Again it is urged, and with some vehemence and iteration, that to sustain the demurrer on the facts of the present record would be to withdraw the benefits of the law and its courts in cases where it is most needed, to wit, the protection of the weak and of the helpless; but, to my mind, this does not correctly interpret the conditions presented. On the contrary, it is well known that the law of North Carolina is full and searching in its protection of dependent, minor children; so much so that a special department of the government is created and its places filled by humane and diligent, capable officials whose special duty it is to exercise supervision over this matter; and in every county in the State special courts have been established before which vicious, or at times even improvident, parents may be summoned, and there have the conditions and treatment of their children inquired into; and in the decisions of these courts the welfare of the child is more and more recognized as the controlling principle. In addition to this, the arm of the criminal law may be invoked, when necessary, to restrain the strong, to punish the vicious, and to protect the weak and the helpless. Truly the law of North Carolina is ample for the purpose indicated, and the courts have been always swift to enforce it by proper procedure. But the disposition of the matter now before the Court in no way impairs, or tends to impair, the beneficent provisions of this legislation. Our present decision merely holds that a minor child, living in the family and dependent upon its parents for support, may not institute a private civil suit of this kind against them for its own pecuniary benefit, a proceeding which would tend to invade and break down the integrity and sanctity of the home, and oftentimes in its practical operation might result in the impoverishment of worthy and struggling parents and utterly disqualify them from performing the duties imposed upon them by the law to maintain and nurture all of their helpless offspring. In my opinion, the opposing position insisted upon by these appellants is unwise in policy, unsound in principle, and without support of any well considered authority.

I concur in the opinion which sustains the demurrer and holds that no right of action is presented.

CLARK, C.; J., dissenting: J. C. Small took out a policy with the Globe Indemnity Company, one of the defendants, "To indemnify the assured against loss from the liability imposed by law upon the assured

for damages as a result of the ownership, maintenance or use of any of said automobiles on account of bodily injuries, including death, at any time resulting therefrom accidentally suffered or alleged to have been suffered by any person or persons," etc.; and the company further agreed in the policy that, "in the event of suit being brought against the assured on account of such accident, to defend such suit, even if groundless, in the name and on behalf of the assured, unless or until the company shall elect to effect settlement thereof."

It is alleged in the complaint, and is admitted by the demurrer, that the assured, J. C. Small, while driving his automobile, had a collision with an automobile driven by John R. Morrison, by "both acting carelessly and negligently at the time," in which Mildred Small, who brings this action by her next friend, was injured; and that J. C. Small is insolvent, and she asks damages for the injuries sustained.

It was held by this Court in *Gorrell v. Water Supply Co.,* 124 N. C., 328, that "One not a party or privy to a contract, but who is a beneficiary thereof, is entitled to maintain an action for its breach." This has been often affirmed and is the settled law in this State and elsewhere.

This is a proceeding in equity by the beneficiary of a policy of insurance against the insurance company and against the men who negligently drove the automobiles, to assess and recover the damages sustained by her in the collision, and to be subrogated to the rights of the holder of the policy of indemnity, who is insolvent; and the defense interposed by the demurrer is that the holder of the policy is the father of the little nine-year-old girl who is seeking to recover in this action. There is no allegation of willful injury by the father, nor any indication that he is seeking to cause by collusion payment of the damages she has sustained.

The indemnity company demurs for misjoinder, and also that the plaintiff could not bring an action against her father. If the plaintiff's counsel had been well advised, he might have joined J. C. Small as a co-plaintiff, but under the reformed procedure it is immaterial on which side of a case a necessary party is placed, for their respective rights as between each other are settled by the judgment. C. S., 602. There was certainly no misjoinder of defendants, for both of the automobile owners are admitted by the demurrer to have acted negligently, and the policy of insurance set out in the complaint agrees to indemnify J. C. Small for any damages to any person accruing in his operation of the machine, and agrees that the defendant company shall be joined in an action to recover the same.

The defense by the defendant insurance company that J. C. Small is the father of the plaintiff is the barest camouflage, for under its contract it must pay any damages that might be sustained by any persons by reason of the negligence of J. C. Small in operating the machine. The

contract does not except injuries to any person, and the company is in no wise affected by the relationship of the party injured to the assured. This defense is interposed by the demurrer, like the traditional red herring drawn across the trail to divert the attention, or like the not unusual resort of defendants to change the issue or to try some other person. Indeed, eminent counsel has declared that when there is no real defense and no third party can be brought in, it is advisable to try the counsel on the other side.

But for the entirely irrelevant fact that the injured party happens to be the daughter of one of the defendants, it is admitted that she could have recovered upon the facts alleged in the complaint and admitted by the demurrer. It is also clear that, being a minor, her father could not have recovered for her any damages claimed by her, but the action must have been brought, as it was, in her name by her next friend.

But the contention presented by the demurrer is that because solely of the relationship, the party injured cannot recover the indemnity which the insurance company has promised to pay any person injured by J. C. Small in operating the machine. This action is in reality one by her against the indemnity company (for the demurrer admits that the father is insolvent) and Morrison.

If we are called on by the demurrer to consider the law applicable if it had been in fact an action by the child against the father, it may be stated plainly and without fear of contradiction that there is no statute or decree in this State, nor by any decision in the common law has it ever been held that a child could not bring an action against the parent. There have been many cases in this and other States and in England where children have brought actions against the parents; for instance, for partition of real estate, for conversion of the child's property, for support, and in other cases, and the right to do so has never been denied.

But it is argued by the defendant, to protect itself from liability for the damages, it agreed to pay those who, like the plaintiff, might be injured in the operation of the machine of the assured, "that such actions have always been other than torts," but this statement cannot be supported. There are cases in our Reports and others where actions have been brought for the children against their parents for conversion or embezzlement of the children's property, for libel and slander, and no decision can be found in England or in this State where the remedy has been denied to the children in any action on account of the relationship. The right of the children to maintain an action for the conversion of their property by the father was recognized in *Dunn v. Beaman*, 126 N. C., 771, and there are many others. The present action is not even for embezzlement or fraud, but merely for negligence and to subrogate the child, who is injured, for the father in the recovery of damages

according to the terms of the policy of the indemnity company for which the father has paid.

But it is claimed that the common law does not permit the child to be the plaintiff in any case in which the parent is a defendant. No case in England or in this State, or in America, as far as the fullest research goes, sustains this proposition. There is no such principle to be found stated in any case.

In 5 Wait's Actions and Defenses, 76, it is said, "In all cases of injury of a personal character, an infant has the same remedies as adults; and though the father of an infant may sue for personal injuries to the latter which cause him the loss of services or the incurring of expenses, yet that will not affect the infant's right of action for the damages sustained by himself. *Hall v. Hollander,* 10 Eng. C. L., 436; 4 B. & C., 660. He may even sue his parent for an unreasonably severe chastisement, amounting to a battery. Reeves Dom. Rel., 288."

In Eversley on Dom. Rel., 554, another English authority, it is said, "The right of a child to bring an action against his parent in respect to the latter's dealings with his property is unquestioned," and adds that whether the infant child can sue its parent for tort is not so clear, but "There is no rule of the common law to prevent such action being brought." And on page 555 it is said, "Where the tort is not for mere personal violence, but some other wrong, such as libel or slander, there does not seem to be any reason why an infant child should not sue its parent and recover compensation."

The following quotation from the 4 Am. Ed. of Reeves Dom. Rel., the leading English work on the subject, shows that at common law an action could be brought by a child against the parent, even for a tort in the most intimate relation. On page 357, it is said the maxim is "that the parent has power to chastise the child moderately. The exercise of this power must be in a great measure discretionary. He may so chastise his child as to be liable in an action against him for battery. The child has rights which the law will protect against the brutality of a barbarous parent." Again, on the same page, it is said, "When the punishment is unreasonable and the parent acted, *malo animo,* from wicked motives, under the influence of an unsocial heart, he ought to be liable to damages."

In the English Reports, it is said, "It is essential for the protection of infants that suits on their behalf should not be discouraged." *Sir John Leach, V. C.,* in *Stevens v. Stevens,* 6 Maddox, 97. In 2 Reeves English Law, 180, it is said, referring to ch. 15, Westminster II, in the reign of Edward I., providing that infants could maintain an action by a next friend, "This statute has always been construed as giving permission in all cases for infants to appear by their next friend; which, however, is nothing more than a confirmation of the common law."

From the above statements of the leading English authorities as to the common law, it will be seen that no judge in England has ever at any time held that a child could not maintain an action against its father, and that at common law such actions have been maintained not only in respect to dealing with the child's property, but in actions for slander and libel (Eversley on Dom. Rel., 554, 555); and as we have adopted the common law, our courts have no authority to change it unless it has become obsolete or contrary to the humanity of the age. C. S., 970. Two members of this Court, in *Crowell v. Crowell,* 180 N. C., 528, were of the opinion that the courts could not change the common law even when it had become contrary to the spirit of the age, saying that such matter is "addressed to the Legislature, and not to the judicial branch of the government." In *S. v. Bell,* 184 N. C., 719, *Mr. Justice Adams* stated the sound principle of law that "the duty of legislation rests with another department of the government. It is ours only to declare the law, not to make it," and *Mr. Justice Stacy,* in the same case, says that any change in law "is a matter for the Legislature."

Yet in this case we are asked by the defendant insurance company to change the well-settled principles of law as laid down by the English authorities as the common law of that country without a conflicting decision. In our own State the common law has been followed in this respect, and the dockets of the Superior Court swarm with cases where infants have been plaintiffs against their fathers not only in matters concerning the management of their property by the father, but in proceedings to compel him to support them, and in other cases. Some of these cases have come up to this Court, but no one has ever pleaded, and no judge has ever held, that the child cannot sustain an action against the father. To so hold would put children "out of the law" and make them "outlaws"—and why should they be outlawed?

Among the numerous cases in this Court of actions by children against the father is the recent one of *Sanders v. Sanders,* 167 N. C., 319, where the action was brought by two children against their father; and the Court sustained the liability of the father in that action, which was dismissed only because the relief sought of the support of the children had been granted them in another case. In *Dunn v. Beaman,* 126 N. C., 771, the Court held that the children could recover from their father money received for their lands sold by order of court which the father converted to his own use; and there are numerous other cases in which actions by children against the parent have been sustained, and not one in which the child has been outlawed or refused the protection of the court upon the ground set up by this insurance company that the child cannot bring an action against the parent.

In *Kimborough v. Davis,* 16 N. C., 74, a recovery was sustained for the child as beneficiary under a contract in his favor by the father. In

the present case the action is brought upon a policy issued by the insurance company to the father of the little girl, and she is suing to recover from the company the money promised to the beneficiaries of that contract. In *Becton v. Becton,* 56 N. C., 422, an action was brought by the children through parties styled "relators" and not "next friend" as required by the statute, and the decree was held valid.

In *S. v. Bell,* 184 N. C., 701, we have the same state of things, for though the action was brought in the name of the State, it was in effect entirely a civil proceeding in behalf of the four infant children for support against the father, who had abandoned them, for there was no penalty or fine prescribed in the statute (C. S., 4447), but merely a decree that the father should pay monthly the sum of fifty dollars for the support of the children. It was simply a civil proceeding, the State acting through the solicitor as the next friend, the four little children being the real parties in interest.

*Walker v. Crowder,* 37 N. C., 478, is another of the numerous cases in our Reports where the action was brought by the children against the parents to recover the value of their property which the father had wasted; and that case has been cited, among many others, in *Haglar v. McComb,* 66 N. C., 361, where the children recovered in an action on their behalf against the administrator of the father.

In *Burton v. Belvin,* 142 N. C., 153, the Court gave a recovery in the name of the mother for the benefit of an illegitimate child whom the father had promised to support, the Court holding that such proceeding, as in the late case of *S. v. Bell, supra,* "is not for the enforcement of punishment, but is in effect a civil remedy for the support of the woman and child and to save the taxpayers that expense," citing *S. v. Lisle,* 134 N. C., 735.

In *S. v. Kerby,* 110 N. C., 558, it was again held that a proceeding under the statute, which is now C. S., 4447, was in effect a civil proceeding in behalf of the real beneficiaries, the children, as the "true parties in interest," but in the name of the State as next friend, there being no punishment imposed, but a decree entered for a fixed amount to be paid by the father for the support of the children.

In *Gully v. Gully,* 15 A. L. R., 564, it was held that a decree could be entered against the father for support in behalf of his minor children, and on pp. 569-571 this is fortified by numerous citations from many States, among others, citing *Sanders v. Sanders,* 167 N. C., 319, in which the action was brought, as above stated, by two children against their father for support.

The same principle is laid down in 9 A. & E. (2 ed.), 871, holding the father liable to the children for their support, even when there has been a decree of divorce which is silent as to the custody and support of

38—185

the children. These actions were evidently brought by a next friend, for no one else had authority to sue for them as the true parties in interest, and the identical names of the plaintiffs and defendants, as cited in the note, indicate the same.

In 14 Cyc., 812, it is said that at common law the father remains primarily liable for the support of the children even when there has been a divorce and the custody of the children has not been awarded to the mother. The authorities cited to that effect are numerous. The same is held, with citation of numerous authorities in 19 C. J., 353, even when there has been a divorce and the custody of the children has not been awarded to the mother or any one else; and the note cites the above case of *Sanders v. Sanders,* 167 N. C., 319, where the action, as already stated, was brought by two children against their father for support, and, indeed, could have been brought by no one else except by them, either through a next friend or at the instance of the solicitor, as in *S. v. Bell,* 184 N. C., 702; and exactly the same liability of the father for support in an action on behalf of the children is set out in 8 R. C. L., 307, and 20 R. C. L., 622, calling attention to the fact that the proposition that a father was not liable to an action on behalf of his infant children for their support, as held in one early American case "was startling and opposed to any sense of justice of the courts."

As it is well settled, therefore, that actions lie in behalf of children, usually through their next friend, as in the present case, for conversion or embezzlement of their property by the father, or to recover a decree for their support by him, and in other cases, and there is no statute or decision in the English courts or in this State to deprive the child of the right to have its wrongs heard and passed upon in a court of justice, by what authority can we in this Court now create the "outlawry" of the children of this State, and hold that the courts cannot redress their wrongs when inflicted by the father?

As was said in *Pressly v. Yarn Mills,* 138 N. C., 410, "The law is not fossilized. It is a growth. It grows more just with the growing humanity of the age and broadens with the process of the suns." The advance of civilization is reflected nowhere more surely than in the administration of justice. As *Lord Erskine* said, "Morality comes in the cold abstract from the pulpit, but men smart practically under its lessons when we lawyers are the teachers."

The crudeness, not to say the brutality, of the common law, framed in a rude age, has been gradually modified by later decisions and statutes making the law more humane, and opening the door of justice more widely to all, without distinction of race, color, age, or sex. Much of this has been done by statute, but where the statute has lingered the courts have led the way of wider justice to all without distinction.

Never before now has this Court ever been called upon to take the backward track and bar the claim of justice to the weak, or to "outlaw" the children of the land from their just demand to have their pleas heard for redress of wrongs.

In a rude and barbarous age Hebrews were debarred not only from holding office, but outlawed from testifying in the courts, a position in which it is now sought to place the children of this State; but the day long since came in England when a Jew, as prime minister, elevated the chief executive of that land, though a woman, to be empress over hundreds of millions of people in India; and this Court, in a recent decision, in *Munick v. Durham,* 181 N. C., 188, declared their equality before the law in every respect.

At common law a woman could not sue her husband because on marriage her property became his, and any recovery by her against him would have been useless. By the Constitution of 1868, she was given her property and the right to sue her husband, but in *Price v. Electric Co.,* 160 N. C., 450, the majority of the Court held that, notwithstanding this change in the Constitution, the husband alone could recover, for his own use and benefit, damages for her personal injuries and for the agony, when the jury had assessed the wife's injuries. The succeeding Legislature promptly corrected that wrong. Laws 1913, ch. 13.

For centuries wives had to endure under the common law the brutalities of their husbands, because, as is claimed by the insurance company in the present case, to "give publicity to family troubles is not advisable," and therefore it was held in the courts of this State, till *S. v. Oliver,* 70 N. C., 61, in 1874, nine years after the whip had been taken from the hand of the master, that the husband was still master of his wife, with the right to use the lash on her at his will, and that she could not complain to a court of justice for protection, except in cases of permanent injury, one judge saying that this was "necessary because it was the husband's duty to make her behave herself" (*S. v. Black,* 60 N. C., 263), and a later decision put it on the ground that to allow the wife to ask protection of a court would be unseemly publicity, and therefore the courts must stifle the sobs of the victims, and held that their demands for justice and protection could not be heard in a court of justice. *S. v. Rhodes,* 61 N. C., 454.

For years it has been common knowledge that, owing to the immorality of husbands, women have been subjected to the untold horrors of shameful disease, wrecking their health and causing them to bring into the world deformed and imbecile children, or tainted with insanity or criminal tendencies, but the courts would hear no complaint from the wife because it was "better that such things should not be blazoned to the public."

We know that in the late war the examination of soldiers for service brought out the fact that in North Carolina the percentage of men rendered unfit for service due to this fact was larger than in almost any other State in the Union. The medical profession tells us that insanity, imbecility and predisposition to crime are largely due to this cause, but for years the wife could not make complaint. She had no remedy at the hands of the law because, as the insurance company claims in this case, "it were better that publicity in domestic matters should not be aired in public." But in consequence of the act of 1913, the ban of outlawry upon the wives of this State was lifted, and in *Crowell v. Crowell,* 180 N. C., 524, this Court declared the emancipation of women and their full admission to demand justice in the courts in these words, "Whether a man has laid open his wife's head with a bludgeon, put out her eye, broken her arm, or poisoned her body, he is no longer exempt from liability to her on the ground that he vowed at the altar to love, cherish and protect her. Civilization and justice have progressed that far with us, and never again will the sun go back ten degrees on the dial of Ahaz. Isaiah 38:8."

At common law the wife was outlawed from demanding justice in the courts, and her property became that of her husband. But no judge in England nor in this State, till this hour, has ever held that children could not complain to the courts and obtain remedy against the father for injuries to their property or their person. Why should we turn back on the road of justice and civilization and by judicial decree make them outlaws now?

The time was when slaves and convicts had no rights and could not be heard in the courts to complain of mistreatment, nor were their oaths admissible even in behalf of others in a court of justice. But there are no slaves now. And even as to convicts, in *S. v. Nipper,* 166 N. C., 272, and *S. v. Mincher,* 172 N. C., 900, this Court condemned the brutality and illegality of the corporal punishment of convicts, and held that they were entitled to be heard and their oaths taken in a court of justice. They are no longer "outlaws" whose complaints cannot be heard in a court of justice.

The insurance company in this case is asking that we shall, by judicial fiat, make the children of this land "outlaws" when outlawry has ceased as to all other classes of the community, and has never existed as to children, and it can be said in the language of Bishop Hooker, the great English divine, "Of law, the least that can be said is that her voice is the harmony of the universe. All things in heaven and earth unite to do her reverence. The greatest as subject to her power and the least as sheltered by her protection."

SMALL *v.* MORRISON.

In the progress of the ages we have admitted the right to be heard in the courts of women, of men of all races and complexions, and of convicts. The defendant insurance company asks that we shall now turn back the clock of the ages and the onward sweep of universal justice by decreeing that it shall be exempted from the payment of the damages sustained by this little girl because in this equitable proceeding to subrogate her to the rights accruing to her father for damages sustained, it is necessary to make the father a party, and therefore she cannot be heard.

Policies of insurance like the present, agreeing to pay damages adjudged against the owners of automobiles because of their negligence are now common, and there is no exception in the present policy of injuries sustained by any one. At this very term, in *Roberts v. Roberts, ante,* 524, we have held that the wife, who was injured under similar circumstances as in this case, could recover against her husband. Upon what principle of law, by what rule of logic, shall we hold that the little daughter who was injured, probably for life, and who is the beneficiary of the same provision in the policy, shall not recover simply because her father as the policyholder is a necessary party in the equitable proceeding to assess the damages she has suffered, and she seeks to be subrogated to the rights of the insolvent father to recover as beneficiary under the terms of the policy.

We have held in *Roberts v. Roberts, supra,* that the wife can recover of the husband her damages, as in *Crowell v. Crowell, supra,* the object being to collect the judgment out of the insurance company. In this case, instead of a simple action at law of that nature, this equitable proceeding is brought, as in *Benton v. Collins,* 118 N. C., 196, where the action was for tort, the shooting of plaintiff, and in *Fisher v. Trust Co.,* 138 N. C., 224 (action for fraud), making the owners of both automobiles, the insurance company, and the beneficiary of the policy all parties, to the end that the negligence and injuries, the assessment of damages and the rights of the beneficiary shall all be determined in one action.

This is in accordance with the theory and practice of the courts of equity, and justice demands that the little girl shall receive the compensation which is due to her under the terms of the policy, and there is no foundation in precedents or logic or law which can justly debar her from standing at the seat of justice and being heard because the insurance company claims that it is "unseemly that a child should be on the opposite side of a case from her father." The dockets of the courts and the Reports of the courts show many instances in which children have appeared as plaintiffs and their fathers as defendants.

In *Bird v. Black,* 5 La. Ann., 189 (1850), it was recognized that there was no legal prohibition against a child's suing its parent in any class of cases, for it held that, "Suits of children against parents are not to be encouraged unless to redress clear and palpable injuries. Filial duty ought to restrain the child from exposing the faults of its parents or worrying them with litigation unless compelled by extreme necessity."

In *Clasen v. Prugh,* 69 Neb., 278, it is held, "A parent, or one *in loco parentis,* is not liable, either civilly or criminally, for moderately and reasonably correcting a child, but it is otherwise if the correction is immoderate and unreasonable," which is a clear recognition that actions will lie by a child against its parents even in that class of torts.

The very first indication of any limitation upon the right of the child to recover against the parent will be found not in the common law, but in *Hewlett v. George,* 68 Miss., 703; 13 L. R. A., 682, as late as 1891, where it was held that a child wrongfully imprisoned in an asylum could not bring an action against her mother therefor. That decision does not allege that such action was prohibited at common law, but states that it is based upon the Court's opinion of public policy." Thus, the Court itself was making the law. That case is printed in 1 Anno. Cas., p. 132, and the notes thereto state that it was then "The only authority forbidding an action by a child against a parent." This was followed by *McKelvey v. McKelvey,* 111 Tenn., 388 (1902), reprinted in 102 Am. St., 787, and in the note thereto, on p. 790, it is stated that the decision of the Mississippi Court is "the only authority prior to that case "setting up this doctrine," and on p. 788 (102 Am. St.), it is said that "no less celebrated an authority than *Judge Cooley* on Torts, at p. 171, observes that "On principle there is no reason why such action should not be maintained," and adds that "With the utmost diligence, the only case found prohibiting such action was the Mississippi case above cited, and that is based not upon the common law, nor upon statute, but upon the ideas of that judge as to the public policy of permitting such actions." On the next page (p. 789) the Court says such prohibition can be asserted only by analogy to the right of a wife to sue a husband, and quotes from 67 Maine, 304, which said, as to the right of a wife to sue her husband (which has been allowed in this State for now more than half a century), that the wife cannot bring such action because "there is no necessity for it. Practically the married woman has remedy enough." Adding that she can have a writ of *habeas corpus,* and if necessary, she can bring an action for divorce!

In *Roller v. Roller,* 37 Wash., 242 (107 Am. St., 805), 1905, it is held that "a minor child cannot sue his parent for damages arising from tort committed by the parent against the child, where the relation of parent and child exists," but that case which was for personal violence to

the child is put upon the ground of public policy, and is based entirely upon *Hewlett v. George,* 68 Miss., 703, which it says is "the only one that we have been able to discover" which lays down that doctrine.

In *Foley v. Foley,* 61 Ill. App., 577 (an intermediate court), it is stated that an action by a child for physical ill-treatment against one *in loco parentis* will not lie, but no authority is stated for the proposition, and there are numerous cases in the reports of such actions against those *in loco parentis* for brutal treatment.

In 29 Cyc., 1642, it is said, "Where the tort is purely personal to the child, it seems that the parent cannot recover," but the cases cited show that this means that the action must be brought by a next friend and not by the father. In 29 Cyc., 1663, it is said, "Actions by children against their parents are not to be encouraged," citing *Myers v. Myers,* 47 W. Va., 487, "unless to redress clear and palpable injustices," citing *Bird v. Black,* 5 La. Annual, 189, *supra,* which recognized that the action lies, and added "and a minor child has no right of action against the parent for the tort of the latter," but the cases cited for the latter proposition are, as already stated, all based upon *Hewlett v. George,* 68 Miss., 703; 13 L. R. A., 682, which originated such proposition in 1891. Yet these are the authorities and the line of reasoning upon which defendant seeks to create for its own benefit a new proposition in this State, not based on common law or any statute, that shall deprive a child of the right to sue its parent in any case whatever.

In Schouler on Domestic Relations (3 ed.), 275, note 3, it is said in the note that precedents are wanting which hold that a child could not maintain an action against its parents, and added that "the policy of the common law appears to be hostile to permitting such suits," but no case is cited to that effect. If there had been such policy it would have been clearly enounced by numerous decisions.

*Judge Cooley,* in his great work on Torts (2 ed.), marginal page 171, says that "on principle, there seems to be no reason why such an action of a child against a parent should not be sustained."

The above are the only decisions denying the child the right of action against parents for its wrongs that we have been able to find, and all of these refer back to the Mississippi case in 1891, and in none of them is it asserted that there is a statute anywhere or any ruling in the common law which forbade an action by a child against its parent in any respect. Certainly the Mississippi Court, in 1891, could not create the common law for this State, and there can be no prohibition of such action to redress a grievance by the child against the parent unless there was a statute of this State, or it could be shown that it was a part of the common law. The reason given in these few decisions, all of such recent date, and only in actions for willful injury to the child, is either that

(in the opinion of the judges who followed the Mississippi case) sound policy forbade such action, or that by analogy to the prohibition formerly of actions by wives against their husbands, the courts would not permit an action by the children against parents. But in view of the common-law reason for prohibiting wives to sue their husbands, this latter argument could have no force. Besides, the same reason could not have applied between parent and child.

The common-law prohibition against actions by the wife against her husband—now happily universally repealed—was created solely by decisions of judges in the illiterate period when there was practically no statute law in England, and these judges during the formative period of the common law were, as pointed out by *Pollock & Maitland* and other writers on the subject, mostly priests or monks of the Catholic Church for nearly the entire period. They saw fit to lay down the prohibition of action by wives against husbands upon the ground of the unity of husband and wife, as stated by *Adam* in II Genesis, 23. The real reason, however, was the fact that by the customs and economical conditions of that age, the wife was a chattel absolutely subject to the control of the husband, and upon marriage her property became his. Logically, therefore, if she could have brought an action against her husband for damages, the recovery would have inured to the husband. Of course, under these circumstances no action would lie. But as to the child, it was held in that day, as now, that his property, where he had any, was his own, and the father could not sue to recover property or damages for the child. Even as to real estate, it was then held that it would descend, but would never ascend, and, therefore, the father could not even inherit from the child, and all the decisions were then, as now, that it was necessary to have a guardian appointed for the child's property. The extent of the father's interest therein now reaches no further than this, that in the appointment of a guardian, other things being equal, the father will be preferred for appointment by the court.

As to the allegation that there is a remedy by an indictment and not by a civil action, this was never a defense to actions against the father for embezzlement or conversion of the property of the child, both of which are indictable. In those cases, as in this, indictment would be no. reparation to the child, and besides, in this case, the injury is alleged to have been caused by negligence, and therefore the father was not even subject to indictment, and the action is, in fact, against the insurance company and not against the father.

The provision that no action shall lie against the company unless brought after the amount of such claim or loss shall have been fixed and rendered certain by a judgment against the assured taken alone might justify sustaining the demurrer for misjoinder; but the further

provision in the policy by which the company agreed, "in the event of suit being brought against the assured on account of such action, to *defend such suit,* even if groundless, in the name or on behalf of the assured," together with the allegation in the complaint, which is admitted by the demurrer, that nothing can be recovered against J. C. Small upon execution, makes in effect the defendant company and Morrison the necessary, if not the sole and real defendants in the action.

In no view can the demurrer of the indemnity company on the ground that the plaintiff cannot bring an action against her father for the tort be sustained. That in no wise concerns the indemnity company, whose obligation is to pay whatever damages shall be adjudged against J. C. Small, which matter, to a great extent, will depend upon whether he was or was not jointly responsible with the codefendant Morrison in causing the accident. If there was no negligence on the part of Small, the action could still be sustained by the plaintiff, certainly as to the defendant Morrison, if negligence was shown as against him.

To sum up, therefore, this is an action by a child injured in an automobile accident, seeking to recover damages for negligence against the insurance company upon its contract to indemnify her father for any damages caused by his negligence in the operation of his machine. The indemnity company in setting up the plea that the child cannot sue the father is not seeking to carry out the Fifth Commandment or to enforce relations between parents and children, but to exempt itself from its obligation to the father, made in consideration of his money paid for that purpose, of reimbursing him for any damages which might be caused to any one by his operation of the machine. There is no statute and no common law forbidding the child to make this recovery to which besides it is entitled under the very terms of the contract as well as under the general law as being a beneficiary therein.

There is no provision in the common law nor by any statute forbidding the child to maintain an action against the parent in any case, and the very few decisions in this country that forbid such action did not originate in common law, or by statute, but began, as above stated, with the Mississippi decision as late as 1891, and they only imposed a restriction to the extent of forbidding actions for personal violence towards the child by the parent. Even that ruling would not apply in this instance, where the action is by the child as beneficiary of a policy for indemnity, when there is no violence exerted by the parent against the child, and the relationship is purely an incidental matter and irrelevant, by which it is sought to exempt the indemnity company from its liability upon the policy it issued to the father.

The doors of the Temple of Justice should always stand wide open, and to every one. Least of all should they be closed to the weak and

"those who have no helper," for most of all they need its protection. The common law, framed in a rude and illiterate age, gave to husbands the property of their wives upon marriage, but it never gave to fathers the property of their children. The common law brutally gave to the husband not only the property and personal earnings of his wife, but the right to recover and to appropriate to his own use compensation for injuries to her person and for her sufferings and her agonies, and even for the loss of a limb, because she was his property. *Price v. Electric Co.,* 160 N. C., 450. But the common law never gave to the father the right to sue for damages for personal injuries sustained by his child, except to recover the value of his wages until of age. Such action, then as now, must be brought by the child. There were thus radical distinctions at common law between the status of wife and child.

But recently in the adjoining county from which this case came a father so treated his little daughter that it was found necessary to incarcerate him in jail to save him from summary justice at the hands of his fellow-citizens. If he were a wealthy man, he might still carry his animosity to the extent of depriving her of all share in his estate. Suppose her injuries were permanent as the loss of an eye or an arm, whether she was nine years of age or twenty, should she be deprived of all compensation for the damages she has sustained simply because the wrongdoer was her father? There has never been such a holding in the common law, nor such statute anywhere, and no such decision in this State. By what authority can the courts now create such law, and by their own fiat shut the doors of justice in the faces of the helpless, who do most need protection?

The assertion that this should be done upon the ground of public policy is not for the courts, but for the Legislature. It was upon the same plea that it was better that even unutterable wrongs should be suffered by wives and endured by the victims in silence than that there should be publicity given to the wrongdoings of husbands, which wrecked the bodies and lives of wives, and that without remedy until the act of 1913 enabled this Court to make the decision in *Crowell v. Crowell,* 180 N. C., 516, followed in *S. c.,* 181 N. C., 66; *Dorsett v. Dorsett,* 183 N. C., 356, and by *Roberts v. Roberts, supra.*

There was never common law nor statute to justify the denial of legal rights to children. The courts should not create law to exclude them from justice when there has been a legal wrong. In a recent work, Pound's Common Law, 189, it is said, "Recent legislation and judicial decision have changed the whole attitude of the law with respect to dependent members of the household. Courts no longer make the natural rights of parents with respect to children the chief basis of their decisions. The individual interest of parents, which used to be the one

thing regarded has come to be almost the last thing regarded as compared with the interest of the child and interest of society. In other words social interests are now chiefly regarded."

This case is an attempt by the plaintiff to reverse this order and to create for the purpose of the indemnity company a principle never heretofore existing at common law or by statute, or by decision in this State, and which will, if followed, subject all persons under twenty-one to exclusion from compensation for any injury if inflicted by those who ought to be and usually are their protectors. But while the majority of parents are kind and forbearing, the law is especially for the protection of the helpless, who are unable to protect themselves against wrongdoers.

The plea that publicity should be avoided by silencing the cries and ignoring the suffering of the helpless is not one that commends itself to humanity. Publicity and the arm of the law are what is needed for the protection of those who are otherwise in the absolute and irresponsible power of those who inflict injuries. While this case is not an allegation of a willful wrong by the father against the daughter, the assertion of the irresponsibility of the parent and his immunity against all claims of children for protection at the hands of the law should not go unchallenged.

Even if it had been true that "at law," under the old system, the daughter could not maintain this action because her father was necessarily one of the defendants, the court of equity to "prevent a defect of justice" would have maintained the suit that the daughter should not lose the compensation for her injuries due by the company under its contract with her father. She was entitled to this, both because her father was insolvent, and because unless the action was brought in her behalf by her next friend she would be deprived of the recovery. The father could not bring an action for damages for personal injuries sustained by her even if he were not a defendant, but it must be brought by her next friend. 20 R. C. L., p. 615. He could not pay her the damages even if solvent and recover it of the company, for to prevent collusion the terms of the policy require that there must be a judgment against him, to which action the company must be made a party. It would be a most flagrant defect of justice if, under all these circumstances, this proceeding in equity by the next friend could not be maintained. It should be held, as it is in fact, to be a suit in equity, and all the defendants are necessary parties thereto. *Fisher v. Trust Co.,* 138 N. C., 224; *Benton v. Collins,* 118 N. C., 196, and numerous others cited in those cases and in the annotations thereto.

It is the essential function of the courts to administer justice, and while they will not overrule a statute, they should not hesitate to overrule a precedent to attain that end when it has not become a rule of

property. For a stronger reason, the courts should never *create* a precedent (when there is, as here, neither statute nor precedent) upon a supposed public policy, and when, as in this case, it will deprive any one of just rights.

The wife has obtained after a long struggle the right to be heard in courts of justice against wrongs inflicted by her husband, which was denied her formerly upon the ground that "domestic troubles should not be brought into court, and therefore the victim should suffer unheard." There was never a provision of common law or in this State which deprived the child of maintaining its right to recover for its property wasted by the father, or to a support at his hands, or for the wrongs inflicted by him, and there is no authority in the courts to create a disability now where none has existed up to this time. Justice should be done to all. The complaints of all should be heard and wrongs, if proven, redressed without distinction of race, of sex or of age.

*"For justice, all places are a temple and all seasons summer."*

The Master said, "Suffer little children to came unto me and forbid them not." Certainly justice should not forbid them to plead their wrongs at her altar.

The demurrer should be overruled and a jury should determine whether the plaintiff has been injured by the negligence of both or either of the automobile owners, and if so, the damages she is entitled to recover. If any part of the injury is found to have been caused by the negligence of J. C. Small, the plaintiff, as beneficiary in the policy, should be subrogated to the amount of his recovery against the indemnity company.