WILLIAM HAROLD HENSON AND DOLORES ELAINE HENSON, MINORS, BY THEIR NEXT FRIEND, WILLIAM M. HENSON, v. CECIL THOMAS.

(Filed 30 November, 1949.)

**1. Common Law—**

So much of the common law as has not been abrogated or repealed by statute is in full force and effect within this State, G.S. 4-1. There is no common law right of action by children against a third party for disrupting the family circle and thereby depriving them of the affection and care of their parents.

**2. Courts § 1—**

It is the province of the courts to declare the law as it exists and not to create causes of action by engaging in judicial empiricism.

**3. Parent and Child § 3c—**

Children may not maintain an action against a third person for criminal conversation and alienation of the affections of their mother. There is neither common law nor statutory basis for such action; and the problem is sociological rather than legal.

SEAWELL, J., dissenting.

ERVIN, J., concurs in dissent.

APPEAL by defendant from Sharp, Special Judge, September Term, 1949, RANDOLPH. Reversed.

Civil action to recover damages for criminal conversation with and alienation of the affections of plaintiffs' mother, heard on demurrer.

Plaintiffs are the infant children of their next friend and his wife, Estelle Henson. They allege in substance that they and their parents lived happily together in a new home; that defendant, for the purpose of seducing their mother and alienating her affections, paid constant court to her; that as a result of his improper attentions she was induced to leave home on various occasions and go to other cities where she engaged in illicit relations with him; that he thereby alienated the affections of their mother, goaded their father into leaving home, and caused them to lose the companionship, guidance, and care of both their father and mother and brought disgrace upon them to their great hurt and damage. They allege their mother, through the inducement and allurement of defendant, was absent from home from time to time, but they do not allege that she has abandoned them or her home or that she does not still live with them.

The defendant demurred for that the complaint fails to state a cause of action. The demurrer was overruled and defendant appealed.

*Ottway Burton for plaintiff appellees.*
*Miller & Moser for defendant appellant.*

BARNHILL, J. May children, acting through their father as next friend, maintain an action against a third party for damages for wrongfully disrupting the family circle and thereby depriving them of the affection, companionship, guidance, and care of their parents? This is the question posed for decision. We are constrained to answer in the negative.

There is no statute in this State creating a cause of action such as the plaintiffs here seek to assert. If it exists, the basis therefor must be found in the common law.

So much of the common law as has not been abrogated or repealed by statute is in full force and effect within this State. G.S. 4-1. But an action such as this was not known to the common law. The mutual advantages, privileges, and responsibilities of members of the family circle were deemed to be social rather than legal. With few exceptions, loss of these benefits, either through an act of a member of the family group or of a third party, could not be recompensed through an action at law.

One spouse could not sue the other, *Scholtens v. Scholtens,* 230 N.C. 149, and a child could not maintain an action in tort against his parent. *Small v. Morrison,* 185 N.C. 577, 118 S.E. 12. The husband could sue a third party for criminal conversation with, and the alienation of the affections of, his wife; but the action was grounded on the common law conception of the husband's property right in the person of his wife.

"The peace of society, and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent." *Small v. Morrison, supra.*

The mutual rights and privileges of home life grow out of the marital status. Affection, guidance, companionship, loving care, and domestic service constitute, in part, the mother's contribution to the happiness and well-being of the family circle. Such obligations on her part are not legal in nature and may not be made the subject of commerce and bartered at the counter. *Ritchie v. White,* 225 N.C. 450, 35 S.E. 2d 414.

Here there is no allegation of abandonment. If the mother is guilty of nonsupport, the statute provides a remedy, Chap. 810, Session Laws 1949, and this remedy is exclusive. *Allen v. Hunnicutt,* 230 N.C. 49.

If the defendant seduced the mother and thereby caused the father to leave home, the cause of action for the resulting damages rests in the father and not the children. If the father abandoned his children, whatever the cause, he is the one who must answer therefor.

The demurrer admits that plaintiffs have been deprived of the companionship, guidance, love, and affection of their mother. This was brought about by the act of the mother in withdrawing these incidents of family life from them. In so doing she has committed no legal wrong for which redress may be had in a court of law.

A child may expect its mother to make these contributions to the home and confidently anticipate that she will ever maintain and preserve her chastity. Yet it may not be said that when she gave it birth, she thereby assumed a legal obligation not only to give it love and affection but also to guard with jealous care the purity and uprightness of character the child so trustfully expects of its mother. These are matters within her keeping. The measure of their contribution is controlled by her willingness and capacity.

Since the mother, who is a free agent, committed no legal wrong for which redress may be had in a court of law, it cannot be said that the defendant, who allegedly induced her to be remiss in her domestic duties, incurred any greater liability than the law attaches to her act.

To hold otherwise would mean that every time a person persuades or induces a mother to engage in other activities to such an extent as to cause her to neglect her children, he commits a tort for which he may be compelled to respond in damages. The only difference lies in the gravity of the wrong and the extent of the damage.

The problem here, in its last analysis, is sociological rather than legal. No one would question the fact that a child has an interest in all the benefits of the family circle. Nor may it be denied that the legislative

branch of the government may give this interest such legal sanction as would make the invasion or destruction thereof a legal wrong.  So far, it has not deemed it wise to do so.

It is contended, however, that there is no statutory prohibition against this type of action; that the integrity of the relations and social considerations demand judicial recognition of defendant's liability for enticing plaintiffs' mother from the family home.  But the social considerations and the alleged necessity or advisability of protecting the family relation by upholding the action here contended for are arguments more properly addressed to the legislative branch of the government.

"The 'excelsior cry for a better system' in order to keep step with the new conditions and spirit of a more progressive age must be made to the Legislature, rather than to the courts." *Gowin v. Gowin*, 264 S.W. 529; *Garza v. Garza*, 209 S.W. 2d 1012.  Our province is to enforce the law as we find it and to determine the existence or nonexistence of such a cause of action by the state of the law as it now exists.  In doing so, we are not permitted to find a way out for plaintiffs by engaging in judicial empiricism.

The asserted cause of action was not known to the common law.  It has no statutory sanction.  It is not for the courts to convert the home into a commercial enterprise in which each member of the group has a right to seek legal redress for the loss of its benefits.  It follows, therefore, that the court below erred in overruling the demurrer.

This conclusion is in accord with the decisions in other jurisdictions. *Morrow v. Yannantuono*, 273 N.Y.S. 912; *Rudley v. Tobias*, 190 P. 2d 984; *McMillan v. Taylor*, 160 F. 2d 221; *Taylor v. Keefe*, 56 A. 2d 768; Pound, Individual Interests in the Domestic Relations, 14 Mich. L. R. 177, at p. 185; 2 Cooley, Torts, 4th Ed., 41, sec. 174; Prosser on Torts 936; Vernier, American Family Laws, Vol. IV, p. 480; sec. 267.

There are two cases *contra* which sustain the contention of plaintiffs: *Daily v. Parker*, 152 F. 2d 174, 162 A.L.R. 819, and *Johnson v. Luhman*, 71 N.E. 2d 810.  In each of these cases, however, the court concedes that it is creating a cause of action not theretofore known to the law.  This is a procedure we are not privileged to follow.

The judgment below is

Reversed.

SEAWELL, J., dissenting:  I do not believe any reasonable person will deny that the infant plaintiffs have complained of a definite violation of duty on the part of defendant calculated to inflict upon them injuries of a serious nature.  The injury complained of is a natural and probable consequence of the conduct denounced, calculated to subject complainants to shame and disgrace, to make them socially undesirable, and to deprive

them of maternal association, care and instruction; and, following the allegations, causing virtual, or periodical, abandonment on the part of the mother. Few would dispute the fact that plaintiffs' stated cause of action does not satisfy every definition of actionable tort the books afford, and is twin-kin to causes our courts have long entertained without question. Therefore, it seems that in maintaining the position that their grievance is not justiciable, the Court finds itself in a defensive position, —must state satisfactory reasons *why not,*—unless it resorts to legal dogma or fiat, the *"ex cathedra"* finality. The Court has not done the latter. It has given its reasons: Mainly that the cause of action was unknown to the common law, and is not created by any statute. The corollary is that the Court, therefore, cannot act; to do so would "create" a cause of action. There is the further reason advanced that recognition of the injury done the plaintiffs as an actionable tort is inhibited by a policy that forbids the law to intrude upon the peace and harmony of the family.

Addressing my dissent to the first reason assigned for the judicial *non possumus,*—that is, the absence of common law and statutory authority for entertaining the plaintiffs' cause, I may first observe that if there is "no vacuum in the law" there should be none *coram nobis.* If there is no wrong without a remedy, it is a judicial function and duty to find the remedy, not so badly hidden at that, in our courts of general jurisdiction. Until that search proves fruitless we cannot relax on the apologia that it is *"damnum absque injuria,"* or a *"casus omissus"* or whatever other Latin phrase or maxim may be invoked to express, but not explain, the bankruptcy of the law, or the exhaustion of the judiciary. I challenge both assumptions.

We cannot, with any propriety, refer these matters to the Legislature as being the appropriate department to deal with them. This has been done so often that the formula has become a cliché. The Legislature may have sins of its own for which it must do penance, but it is not a scapegoat for the judiciary. The Legislature, with its necessarily casual or occasional dealing with the vast and intricate structure of our legal system, has never attempted to write comprehensively and completely all the rules respecting the rights and remedies to be recognized and observed in the courts. It has not the trained skill, the fitting tools for such a delicate task, the organon necessary to philosophic or scientific approach. For the same reason it has never undertaken to destroy, although it has at times corrected or directed the functional power and duty inherent in the judiciary, on proper occasion, and within its traditional area of free choice to take cognizance of the invasion of natural right; and especially so in those instances where the common law has already built up general rules and categories, from whatever source obtained, in which the inci-

dent situation, however novel, may be classed and included. Our Legislature, fully understanding its limitations, well knowing that it would be impossible for it to create such a system with its multiplicity of relationships and fineness of detail, and fearing that the common law of England in which these things could be found might be lost to us by means of a break in the continuity of government, made the common law our own by the enactment of the statute which is now G.S. 4-1. But whether we inherited the common law by continuity of legal observance and practice, or recaptured it by adoption, we did not thereby acquire a morgue, or a mere dead thing to be administered *cum testamento annexo,* nor did we acquire a mere catalogue of recognized rights and wrongs ending in a *ne plus ultra.* We inherited, or acquired by adoption, the rule by which the common law expanded, and must continue to expand if the result is to be a living law, a fit instrument to govern, to protect rights and prevent injuries analogous to those here inflicted.

While the common law is universally recognized as containing within it a living spirit by which it may be thus expanded, and has been expanded through judicial appropriation or recognition of rules and principles far more than through the imperative *lex scripta,* in the field we are discussing it has long passed the initial stage. Already it has evolved those rules, created the categories, declared the principles within which the case before us may be fittingly framed.

The grievance is one of a social character, of course; so is every other infraction of the duty owed by one member of society to another. The incidence is too deep, however, to be ignored as a thing to be noticed only by "excelsior" minded do-gooders who so constantly and inconveniently disturb the tranquil waters of sociology, or left to the non-curial efforts of society itself to correct the antisocial tendencies and activities of its members; the slow-curing and festering wounds which leave cicatricial marks in the wake of the marauder.

I am not aware of any respectable legal system which divides grievances into two parts: the one sociological, and the other justiciable. Cardozo: The Nature of the Judicial Process, p. 51, *et seq.*

There is no stronger influence felt today in the upbuilding of the law through judicial selection and decision than the social need. It is the one great trend that distinguishes modern law, as influenced by judicial decision, from that of the era immediately preceding. Its humanitarian aspect is proverbial. The judge, standing at the cross-ways of decision in a novel situation, is more apt to search for the social implications and consequences of his choice as a guide to the road he must take. But the democracy of our institutions recognizes society as but the aggregate of the individuals which compose it, finding that the individual right and welfare in matters so intimately connected with life and liberty is not

inconsistent with socially-minded legislation, and that there is no more certain way to serve the best interests of society at large than to visit on the invader of the individual right the full consequences of his violation of a legal duty.

I do not concur in the criticism on "judicial empiricism." It is simply the method of experience by which the judge, acting within the area of his free choice and in the numerous gaps left by legislation arrives at a reasonable decision; and does not refer to the source of the power exercised. It is the gift of the common law and any judge who cites a former decision in support of his opinion,—and we have scattered them on the pages of the reports "Thick as autumnal leaves that strow the brooks In Vallambrosa,"—affirms its propriety and relaxes with a sigh of content. The power of the action has rarely been questioned, and its death has not been adjudicated.

The main opinion brings to the aid of its position the policy, recognized here and elsewhere, that a minor child cannot sue the parent in tort, in a course of reasoning which, it occurs to me, is full of *non-sequiturs*. The rationale of the argument is that since the children cannot sue the mother, it follows that they cannot sue the stranger whose seduction of the mother led to parental neglect, social degradation, and shame.

"Since the mother, who is a free agent, committed no legal wrong for which redress may be had in a court of law, it cannot be said that the defendant, who allegedly induced her to be remiss in her domestic duties, incurred any greater liability than the law attaches to her act."

Thus the opinion transfers the personal immunity from suit of the mother to the defendant, discharging him from liability to the injured infants because she has none, and is unreachable by law. Thus the social equilibrium is balanced and the *pax vobiscum* of the law descends upon it.

To avoid this syllogism the Court will have to do more than refrain from a categorical statement of an unsupportable position. The philosophy remains; and the citations and quotations leave no doubt as to the principles on which decision is based.

I think it is needless to say that the gravamen of the plaintiffs' case does not rest on the grave dereliction of the mother merely. It probes the original unlawful conduct of the defendant which, through her, was causative of the injury. But even if the mother and her seducer were, from a legal point of view, equal partners or joint tort-feasors in the injury inflicted on the children, (which is certainly not the gravamen of the action), two principles apply: First, the children were not required to sue both tort-feasors; and second, the immunity from action enjoyed by the mother is personal, growing out of the parental relation, does not change the character of the act and cannot avail the defendant, or any

other stranger otherwise liable. *Wright v. Wright,* 229 N.C. 503, 50 S.E. 2d 540.

The public policy invoked is supposed to rest on the authority of *Small v. Morrison,* 185 N.C. 577, 118 S.E. 12. "The peace of society and of the families composing society, and a sound public policy, designed to subserve the repose of families and the best interests of society, forbid to the minor child a right to appear in court in the assertion of a claim to civil redress for personal injuries suffered at the hands of the parent."

I do not question this policy as properly applied in *Small v. Morrison,* or the fact that it is in full force; but I do question its application here. I do not believe the Court would be happy in subverting such a policy by a rider written across its face through which the policy, supposedly protecting the home and its inmates in the peace and harmony by refraining from domestic interference by the law, at the same time confers an immunity on a stranger who willfully wrecks the peace and harmony of the home and inflicts upon its inmates injuries which are never healed between the cradle and the grave. It would be a short-sighted policy which would allow strangers to trample with hobnailed boots on ground too sacred for the law to enter with unshod feet.

The two cases referred to in the main opinion—*Dailey v. Parker,* 152 F. 2d 174, 162 A.L.R. 819, and *Johnson v. Luhman,* 71 N.E. 2d 810, are from highly respected courts; and these courts are far from conceding that they are "creating a cause of action" by extending to the cases dealt with the elastic principles of the common law within the area of free judicial choice when new and analogous situations are presented. Both cases go into the marrow of the matter affecting the power and duty of the court in a more thorough way than is permitted me in a dissenting opinion and deserve a reading before the matters with which they deal are treated lightly.

I doubt whether the Court can with propriety go to the extent of regarding the instant case as an attempt to commercialize family relations. It is not, as in *Ritchie v. White,* 225 N.C. 450, 35 S.E. 2d 414, a bargain or contract to be made between husband and wife in which the latter agreed to support the children; and if the Court should seat its decision on moral instead of technical grounds we shall have sustained a moral defeat.

There is nothing revolutionary in recognizing the cause of these infant plaintiffs as actionable, and much that is sanitary and just. In the "cold light" of logical analysis they cannot, without arbitrary discrimination be excluded from the category within which we give, at every sitting, relief to others, the victims of tortious injury, whose causes of action are certainly no more meritorious.

The plaintiffs have, no doubt, put into their pleading some things for which they cannot obtain legal redress. But if the complaint contains anything whatever for which the court may grant relief it should survive a general demurrer. The liberality which the Code Practice necessarily extends to pleadings requires the Court to be diligent in observing their virtues rather than astute in detecting their vices.

The judgment overruling the demurrer should be sustained. Pound: Spirit of the Common Law, 170, 173; 184, 185; *Holmes* in *So. Pacific Co. v. Jenson,* 244 U.S. 205, 251; Cardozo: The Nature of the Judicial Process, pp. 69, 70; *Oppenheim v. Kridel,* 236 N.Y. 156; *Daily v. Parker, supra; Johnson v. Luhman, supra.*

I am authorized to state that *Mr. Justice Ervin* concurs in this dissent.